SCOTT P. THURNER AND YVONNE E. THURNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thurner v. Commissioner
Docket No. 8407-87
United States Tax Court
T.C. Memo 1990-529; 1990 Tax Ct. Memo LEXIS 583; 60 T.C.M. (CCH) 961; T.C.M. (RIA) 90529; October 9, 1990, Filed *583 Decision will be entered under Rule 155. Gaar W. Steiner and Cameron D. Sewell, for the petitioners. William P. Hardeman and Henry C. Griego, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION By notice of deficiency sent to petitioners on December 29, 1986, respondent determined deficiencies, additions to tax, and increased interest as follows: Sec. 6653(a) [1] or
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6621(c)
1980
$ 351,855
$ 17,593
To be determined
1981
512,052
25,603
To be determined For 1981, respondent also determined an addition to tax under section 6653(a)(2) equal to 50 percent of the interest due on $ 512,052. Petitioners claimed substantial losses in 1980 and 1981 from gold and platinum spread [2] transactions arranged through L.M.E. Investments, Ltd., and L.M.E. Commodities, Ltd. (both referred to here as LME). LME was found to have inspired, designed, and executed certain transactions with United States investors which were factual shams in Forseth v. Commissioner, 85 T.C. 127 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. per curiam sub nom. Enrici v. Commissioner, 813 F.2d 293 (9th Cir. 1987), affd. without opinion sub nom. Bramblett v. Commissioner, 810 F.2d 197 (5th Cir. 1987), affd. without opinion sub nom. Woolridge v. Commissioner, 800 F.2d 266 (11th Cir. 1986). Also Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987). On their Federal income tax returns, petitioners deducted losses from the claimed cancellation of the gold and platinum spread transactions. Respondent disallowed the deductions. The primary issues for decision are: *584 1. Whether petitioners may deduct amounts attributable to cancellation of gold and platinum spread transaction contracts in 1980 and 1981. We find that the gold and platinum spreads at issue were factual shams. We also find that they were not entered into primarily for profit. We hold that petitioners may not deduct losses resulting from the claimed cancellation of the loss legs of the gold and platinum forward future contracts. 2. Whether petitioners are at risk for more than $ 108,000 in losses in 1980. We hold they are not. Laureys v. Commissioner, 92 T.C. 101 (1989) is distinguished. 3. Whether petitioners are liable for additions to tax for negligence under section 6653(a) for 1980 and section 6653(a)(1) and (a)(2) for 1981. We hold that they *585 are. 4. Whether petitioners are liable for increased interest attributable to a tax-motivated transaction under section 6621(c). We hold that they are. 5. Whether petitioners are liable for damages under section 6673. We hold that they are not. 6. We also address the following preliminary issues: a. Whether price lists from the American Board of Trade (ABT) are admissible. We do not use ABT data in our analysis and so we do not reach this issue. b. Whether the "leads doctrine" places the burden of proof on respondent. We hold it does not. c. Whether documents from Forseth v. Commissioner, 85 T.C. 127 (1985), are admissible in this case. We do not use the documents from Forseth v. Commissioner, supra, in our analysis and so we do not reach this issue. FINDINGS OF FACT Some of the facts are stipulated and are so found. We note that respondent asserts that the gold and platinum spreads at issue are factual shams. Our use of terms such as loss, gain, position, straddle, option, and transaction, is not necessarily to be construed as a finding that the transactions are not factual shams. 1. Petitioners
Petitioners *586 are husband and wife who resided in Milwaukee, Wisconsin, when the petition was filed. References to petitioner in the singular are to Scott P. Thurner. Petitioners are cash basis, calendar year taxpayers. Petitioner runs a family business in Milwaukee, Wisconsin, and has managed and controlled his own and his family's investments for many years predating 1980. He had been active in high risk investments including oil and gas exploration in the United States and South America and commodities. Petitioner was Chairman of the Board of Trans Delta, a successful venture oil company. In 1980 he and his family realized about a $ 20,000,000 profit from the sale of Trans Delta. On his 1980 return, he reported $ 4,793,361 of capital gains income from the sale, and, after the 60 percent exclusion for long-term capital gains, he included $ 1,941,738 in income. In 1981 petitioner formed T Investment Group, in which he owned about a 20-percent interest at that time. He was the group's managing partner. It was formed to pool family investment resources. Petitioner has invested in commodities since 1972. By 1980 petitioner had invested extensively in many commodities, such as silver, *587 gold, platinum, and other strategic and precious metals. He studied investment advice and market data from various brokers, publications, and seminars. He studied commodities prices and trends by monitoring and charting various commodities daily. Charting was initially done manually and later by computer. He had employees to record, monitor, and chart commodities prices daily. Petitioner made his own investment decisions. Others had input but not discretion to act without his approval. Petitioner employed an accounting and administrative manager, John E. Mackowski. Mr. Mackowski was responsible for financial relationships with brokers, including transfers of more than $ 20,000,000 during each of the years at issue. Mr. Mackowski was also responsible for dealing with different brokerage houses over the years, including LME. Before 1980, petitioner invested in commodity straddles through the United States brokerage firm of E. F. Hutton. Petitioner was at least generally familiar with the tax consequences of his investments during the years at issue. He knew about short and long-term gains and the advantages of taking a loss this year and deferring gain from this year to *588 the next. Petitioner knew that there was a special tax reason for holding an investment six months and one day before selling. He also was aware that a commodity transaction he conducted in May 1981, was done two days before the effective date of a commodities tax reform enacted that year. Generally, petitioner held commodity straddle positions for no longer than nine months. An examination of petitioner's trades during the years at issue shows no canceling of loss legs of straddles except for the gold and platinum transactions at issue. In 1981, petitioners had pensions and annuities income of $ 1,538,133 and interest income of $ 622,796. In apparent anticipation of their tax liability for the year, petitioners prepaid $ 225,417 in estimated tax for taxable year 1981. 2. L.M.E. Investments, Ltd. and L.M.E. Commodities, Ltd.
Petitioner dealt in commodities in silver and other metals through brokers in the United States, as well as LME and J. Sinclair & Company of London. Petitioner gave several reasons for going to London, including, the 24 hour trading there, the more international outlook of London brokers than of brokers in the United States, and his belief *589 that trading was "too regulated in America." The transactions at issue here were conducted by petitioner with LME in 1980 and 1981. LME was found to have inspired, designed and executed certain transactions which were factual shams in Forseth v. Commissioner, 85 T.C. 127 (1985). LME was a broker in the London market. LME did not take contracts for its own account as a dealer. Instead, it laid off contracts as a broker in the unregulated principal to principal market. Petitioner was introduced to LME by C. L. (Bud) Caveness, a nonpracticing lawyer, friend, and business associate of petitioner for over 15 years. Mr. Caveness had been an LME client since 1974 and had invested in gold, silver, spreads, and straddles over the years. Petitioner did not talk to anyone in the United States about LME other than Mr. Caveness. Petitioner and Mr. Caveness went to London in October 1980 to interview the principal people from LME and other London brokerage firms, including the London branch of a United States firm. He met with them extensively to discuss the entire range of commodities markets, investment opportunities, and strategies in connection with strategic and *590 precious metals, futures contracts, forward contracts, spreads and straddles. LME recommended, in addition to the purchase of various strategic metals and silver contracts, which were petitioner's primary initial interest, that petitioner consider investing in a gold/platinum spread. LME representatives told petitioner that LME had American clients, but none were ever named. We note that all taxpayers in Forseth , except Mr. Bramblett ( Forseth v. Commissioner, supra at 133), were introduced to LME through a United States company called InterAct. In contrast, other than in connection with this case, petitioner had not heard of InterAct or any taxpayer in Forseth v. Commissioner, supra.
When petitioner checked on LME at the London branch of his bank, First Wisconsin Bank, he found that the bank did not have a file on LME. He did not try to determine if LME was listed in any publication as a reputable and substantial broker in the commodities market. James Gourlay was the owner and chairman of L.M.E. Investments, Ltd. and L.M.E. Commodities Ltd. James Gourlay was the manager for Competex who developed the commodities transactions *591 for 265 taxpayers in Glass v. Commissioner, 87 T.C. 1087, 1108 (1986), affd. sub nom. Herrington v. Commissioner, 854 F.2d. 755 (5th Cir. 1988), cert. denied 109 S.Ct. 2062, 104 L. Ed.2d 628 (1989), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. Keane v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. Killingsworth v Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Dewees v Commissioner, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. Kielmar v Commissioner, 884 F.2d 959 (7th Cir. 1989), Kielmar v Commissioner (7th Cir. 1990), 1990 US App LEXIS 427, and affd. sub nom. Lee v Commissioner, 897 F.2d 915 (8th Cir. 1989). Competex later changed its name to L.M.E. James Gourlay also had a relationship *592 with the entity, J. Sinclair & Company, which petitioner equated with LME and with which petitioner did business. Paul Gleeson was associated with James Gourlay at LME. Mr. Gleeson became the director of LME during the years at issue. In November 1980, petitioner sent an initial margin deposit of $ 60,000 to LME for the spread at issue here. Petitioner testified that he did not execute a power of attorney. In 1980 and 1981, petitioner established several accounts for himself and T Investments. These included two dollar accounts for the trades at issue here, #09284 and #89005, two sterling accounts bearing the same numbers (#09284 and #89005), and a J. Sinclair dollar and sterling account (#2248). In 1981 T Investments established additional accounts. Petitioner ceased being a customer of LME in 1987 because of a dispute about a commodity purchase unrelated to the transactions at issue here. In 1986 petitioner asked LME to purchase cadmium for him. LME sent petitioner a confirmation of the purchase. Later it was shown LME made no such purchase. The dispute resulted in litigation. Substantially all money owed to petitioner was recovered from LME. 3. Comparison *593 of American and London Commodities Markets
The London commodities market in gold and platinum during the relevant period was a "principal to principal" market. That is, trades occurred off the exchange by means of direct person-to-person contact and price negotiation. Some trading occurs on the floor of the London Metals Exchange, but the majority of trading is done off the exchange in pre-market or after hours trading. London commodities trading can occur 24 hours a day worldwide. All trading both on and off the London exchange floor is done orally at negotiated prices. American and London commodity prices generally track each other. There is a general correlation. However, there can be price differences for brief periods of time when one market is closed and the other is open. Other differences that can affect price differences between London and other markets, include storage costs, interest rates, transportation costs, insurance costs and the like. London has no regulations governing limitations on daily price changes, unlike markets in the United States which can result in short-term price differences between the American and other world markets. 4. The Spreads
*594 a. General Description
As we have found in Glass v. Commissioner, supra at 1101-1104, and in Etshokin v. Commissioner, T.C. Memo. 1990-271, slip op. at 1-4, a commodity futures contract or forward contract is a commitment to deliver or to receive a specified quantity of a commodity at a specified date and price in the future. A futures contract may be offset by taking the opposite position in the same commodity for the same date at the current market price. A person who sells a commodity futures contract is obligated to deliver the commodity on the specified delivery date; this is referred to as taking a short position. A person who buys a commodity futures contract is obligated to accept delivery of the commodity in the specified delivery month; this is referred to as taking a long position. An investor holding only a long or short contract in a commodity has a naked position. An investor holding a long and short contract has a hedged position. The hedge is virtually total if the short and long contracts have the same terms, e.g., the same delivery month. The hedge is not total if the contracts have different delivery months. *595 A commodity futures straddle involves simultaneously holding a long and short position in one commodity. A spread is the same, except it involves two different commodities. The long position and the short position are commonly referred to as the "legs" of the straddle or spread. Petitioner claimed losses from the closing of certain commodity futures contracts by cancellation in 1980 and 1981. When a position was closed by cancellation, LME represented that it would extinguish the responsibilities of the investor thereunder, debiting his or her account for a cancellation fee equal to the amount of loss inherent in the position. In such instances, petitioner did not know how the amount of the loss was determined. When a position was closed by offset, LME would enter into an opposite contract for the purchase or sale of the same quantity and delivery date of that commodity. The transactions at issue here are listed below at paragraph 4d. Generally, the transactions at issue here started as spreads, comprised of long and short forward contracts in equal quantities of gold, on the one side, and platinum, on the other. Losses at issue were claimed based on LME's representation *596 that it closed forward contracts by cancellation. b. The 1980 Transactions
Petitioner analyzed trends in the gold and platinum market over several years and especially from about March to November 1980, when he entered the first gold/platinum spread transaction. Petitioner's decision to enter into a gold and platinum spread was the result of his evaluation and the recommendations of James Gourlay, and Paul Gleeson, both of LME. In 1980, petitioner purchased contracts, setting up spreads that were long in platinum and short in gold. The parties stipulated that petitioner received a letter from James Gourlay, Director and President of LME, dated November 19, 1980, in which Mr. Gourlay thanked petitioner for placing funds for a margin account with LME on the day before. In the letter Mr. Gourlay confirmed that any losses in the dealings in gold and platinum would be restricted to a maximum of $ 108,000. In the letter, Mr. Gourlay, said, "we confirm that any losses in these dealings will be restricted to a maximum loss of 6 percent of this figure ($ 1,800,000), namely, U.S. $ 108,000 (One hundred and eight thousand dollars.)" Petitioner interpreted the letter to mean that *597 LME would try to contain his maximum loss to $ 108,000 for $ 1,800,000 of gold and platinum contracts. Petitioner made purchases on November 21, 24, 25, 28 and December 1, 1980, in account no. 09824. On December 10, 1980, nine days after entering the last spread transaction, petitioner began canceling the loss legs of those spread transactions. The loss legs were long platinum contracts. Paul Gleeson, an agent of LME, told petitioner that there could be a big American tax advantage to selling off half of the spread and going directly into a straddle. Petitioner may have been aware of such a tax advantage at the time. He canceled the long platinum legs of the forward contracts primarily for tax reasons, and possibly to a small degree to avoid further losses. He considered that he was getting about a one-half million dollar loss for 1980 in canceling the forward contracts at issue. He considered the tax consequences of these transactions. On the same days as the 1980 cancellations, petitioner purchased long contracts in gold and held these until they closed both legs on April 2, 1982. When petitioner canceled his 1980 long platinum contracts in 1980 the loss was $ 498,450. *598 When he closed their 1980 spread/straddles in 1982, he had a net loss of $ 19,980. c. The 1981 Transactions
A review of the activity in account no. 89005 shows that, in 1981, petitioner purchased contracts, setting up spreads whereby he was long in gold and short in platinum. These transactions are listed below at paragraph 4d. Forward contracts in gold were purchased on April 8, 9, 10, and 22, 1981, and were canceled on April 29, 30, and May 5, 1981. As in the case of the long platinum loss legs in 1980, petitioner canceled the long gold legs of the forward contracts primarily for tax reasons. He considered that he was getting about a one million dollar loss for 1981 in canceling the forward contracts at issue. He considered the tax consequences of these transactions. On the same day as the 1981 cancellations, petitioner purchased long contracts in platinum. He held these straddle contracts until he closed both legs in January 1983. When petitioner canceled his long platinum contracts in 1981 the loss was $ 1,001,670. When the 1981 transactions were closed in 1983 petitioner had a net loss of $ 40,470. Petitioner did not defer or extend the preset delivery or *599 close out date of any of the transactions. Petitioner reported a short-term capital gain and long-term capital loss on close out of the transactions. There was no conversion of ordinary income into long-term capital gain. d. Summary of the 1980-1983 Transactions At Issue
Petitioner's 1980-1982 trades at issue are summarized in the charts below: THE 1980/1982 TRANSACTIONS     Gold and Platinum trade with LME (Acct. No. 09824, dollar     account) for 1980 spread. P = platinum and G = gold. The     parenthetical number cross-references the line describing the     contract which was canceled or offset. Contract or
Delivery
Troy
Price
Gain or
Date
Trade
Debit No.
Date
Oz.
/Troy
Loss
1.
11/21/80
Long P
115354 (12)
2/22/82
800
$ 762.50
2.
11/21/80
Short G
115373 (21)
4/22/82
800
767.00
3.
11/24/80
Long P
115441 (14)
2/24/82
1,200
753.00
4.
11/24/80
Short G
115497 (22)
4/23/82
1,200
751.50
5.
11/25/80
Long P
115501 (16)
2/25/82
1,200
734.50
6.
11/25/80
Short G
115593 (23)
4/26/82
1,200
748.00
7.
11/28/80
Long P
115711 (18)
2/26/82
700
732.50
8.
11/28/80
Short G
115698 (24)
4/28/82
700
744.50
9.
12/1/80
Long P
116047 (20)
3/1/82
1,000
742.50
10.
12/1/80
Short G
116114 (25)
6/1/82
1,000
772.00
11.
12/10/80
Long G
117041 (26)
7/9/82
800
685.00
12.
12/10/80
CANCEL P
707232 (1)
2/22/82
800
663.00
($ 79,600)
13.
12/11/80
Long G
117320 (28)
7/16/82
1,200
661.00
14.
12/11/80
CANCEL P
707233 (3)
2/24/82
1,200
640.00
(135,600)
15.
12/11/80
Long G
117321 (28)
7/16/82
1,200
660.00
16.
12/11/80
CANCEL P
707234 (5)
2/25/82
1,200
639.00
(114,600)
17.
12/11/80
Long G
117322 (27)
7/16/82
700
659.00
18.
12/11/80
CANCEL P
707235 (7)
2/26/82
700
638.00
(66,150)
19.
12/12/80
Long G
117511 (27)
7/16/82
1,000
664.00
20.
12/12/80
CANCEL P
707236 (9)
3/1/82
1,000
640.00
(102,500)       1980 Total Loss
(498,450)
1981 No Activity
21.
4/2/82
Long G
409942 (2)
4/22/82
800
$ 329.00
$ 350,400 22.
4/2/82
Long G
409943 (4)
4/23/82
1,200
329.00
507,000 23.
4/2/82
Long G
409944 (6)
4/26/82
1,200
330.00
501,600 24.
4/2/82
Long G
409945 (8)
4/28/82
700
331.00
289,450 25.
4/2/82
Long G
409946 (10)
6/1/82
1,000
335.20
436,800 26.
4/2/82
Short G
409947 (11)
7/9/82
800
336.80
(278,560)
27.
4/2/82
Short G
409948 (17,19)
7/16/82
1,700
337.20
28.
4/2/82
Short G
409948 (13,15)
7/16/82
2,400
337.10
(1,328,220)      1982 Total Gain
478,470       Net Loss
(19,980)
*600 THE 1981/1983 TRANSACTIONS     Gold and Platinum trade w/ LME (Acct. No. 89005, dollar account)     for 1981 spread.
Contract or
Delivery
Troy
Price
Gain or
Date
Trade
Debit No.
Date
Oz.
/Troy
Loss
1.
4/8/81
Long G
100015 (20)
4/8/83
3,000
$ 668.20
2.
4/8/81
Short P
100027 (29)
1/7/83
3,000
623.80
3.
4/8/81
Long G
100016 (24)
5/9/83
3,000
674.20
4.
4/8/81
Short P
100028 (37)
2/8/83
3,000
629.80
5.
4/9/81
Long G
100053 (18)
4/8/83
2,400
667.00
6.
4/9/81
Short P
100075 (35)
1/10/83
2,400
623.80
7.
4/9/81
Long G
100054 (28)
5/9/83
3,000
673.30
8.
4/9/81
Short P
100076 (38)
2/9/83
3,000
629.50
9.
4/10/81
Long G
100056 (16)
3/10/83
2,000
637.00
10.
4/10/81
Short P
100084 (36)
1/10/83
2,000
600.00
11.
4/22/81 Long G
100157 (22)
4/22/83
4,000
650.00
12.
4/22/81
Short P
100147 (39)
2/22/83
4,000
612.00
13.
4/22/81
Long G
100158 (26)
5/23/83
3,000
656.25
14.
4/22/81
Short P
100148 (32)
1/21/83
3,000
606.00
15.
4/29/81
Long P
100248 (34)
5/30/83
2,000
593.50
16.
4/29/81
CANCEL G
700006 (9)
3/10/83
2,000
605.40
($ 63,200)
17.
4/29/81
Long P
100249 (31)
6/29/83
2,400
600.50
18.
4/29/81
CANCEL G
700007 (5)
4/8/83
2,400
610.70
(135,120)
19.
4/30/81
Long P
100257 (30)
6/30/83
3,000
603.20
20.
4/30/81
CANCEL G
700008 (1)
4/8/83
3,000
613.20
(165,000)
21.
4/30/81
Long P
100258 (41)
5/30/83
4,000
596.50
22.
4/30/81
CANCEL G
700009 (11)
4/22/83
4,000
613.30
(146,800)
23.
5/5/81
Long P
100385 (40)
6/6/83
3,000
599.50
24.
5/5/81
CANCEL G
700033 (3)
5/9/83
3,000
615.00
(177,600)
25.
5/5/81
Long P
100386 (33)
4/5/83
3,000
587.80
26.
5/5/81
CANCEL G
700034 (13)
5/23/83
3,000
615.40
(122,550)
27.
5/5/81
Long P
100387 (42)
5/5/83
3,000
593.50
28.
5/5/81
CANCEL G
700035 (7)
5/9/83
3,000
609.50
(191,400)    1982 Total Loss
(1,001,670)
1982 No Activity
29.
1/25/83
Long P
404186 (2)
1/7/83
3,000
$ 423.90
599,700 30.
1/25/83
Short P
404192 (19)
6/30/83
3,000
448.00
(465,600)
31.
1/25/83
Short P
404191 (17)
6/29/83
2,400
465.20
(324,720)
32.
1/25/83
Long P
404188 (14)
1/21/83
3,000
466.00
420,000 33.
1/25/83
Short P
404189 (25)
4/5/83
3,000
484.20
(310,800)
34.
1/25/83
Short P
404190 (15)
5/30/83
2,000
463.80
(259,400)
35.
1/25/83
Long P
404187 (6)
1/10/83
2,400
442.00
36.
1/25/83
Long P
404187 (10)
1/10/83
2,000
441.90
752,520 37.
1/31/83
Long P
04832 (4)
2/8/83
3,000
492.10
413,100 38.
1/31/83
Long P
04333 (8)
2/9/83
3,000
492.40
411,300 39.
1/31/83
Long P
04334 (12)
2/22/83
4,000
494.50
470,000 40.
1/31/83
Short P
04337 (23)
6/6/83
3,000
523.30
(228,600)
41.
1/31/83
Short P
04336 (21)
5/30/83
4,000
522.70
(295,200)
42.
1/31/83
Short P
04335 (27)
5/5/83
3,000
519.80
(221,100)   1982 Total Gain
961,200    Net Loss
(40,470)
*601 Cancellation prices were not directly provided by LME. However, when a contract was canceled, a debit note was issued identified by a debit note number and a liquidated damages dollar amount. The debit note dollar amount divided by the number of contract ounces yields a price per ounce. That price per ounce subtracted from the original contract price yields an effective cancellation price which is indicated on the charts. Commissions are not taken into account for these charts because none are separately stated by LME for these accounts. BALANCED POSITIONS
As indicated by the chart below, at the end of each day petitioner was in a balanced position by quantity of gold and platinum. Balanced Position of 1980 Spread
Gold
Platinum Date
Long Short
Long Short
Balance
11/21/80
800
800
- 0 -
11/24/80
1,200
1,200
- 0 -
11/25/80
1,200
1,200
- 0 -
11/28/80
700
700
- 0 -
12/1/80
1,000
1,000
- 0 -
12/10/80
800
800
- 0 -
12/11/80
3,100
3,100
- 0 -
12/12/80
1,000
1,000
- 0 -
4,900
4,900
4,900
4,900
4/2/82
4,900
4,900
Petitioner's open position on December 31, 1980, was *602 that he was long on gold 4,900 ounces, short on gold 4,900 ounces. Balanced Position of 1981 Spread
Gold
Platinum
Date
Long Short
Long Short Balance
4/8/81
6,000
6,000 - 0 -
4/9/81
5,400
5,400 - 0 -
4/10/81
2,000
2,000 - 0 -
4/22/81
7,000
7,000 - 0 -
4/29/81
4,400
4,400 - 0 -
4/30/81
7,000
7,000 - 0 -
5/5/81
9,000
9,000 - 0 -
20,400
20,400
20,400
20,400
1/25/83
10,400
10,400 - 0 -
1/31/83
10,000
10,000 - 0 -
20,400
20,400
Petitioner's open position on December 31, 1981, was that he was long on platinum 20,400 ounces, and short on platinum 20,400 ounces. e. Additional Findings Relating to the 1980 and 1981 Gold and Platinum Transactions
(1) Initial Trading Date. LME received the first margin money from petitioner on or about November 19, 1980, and trading activity commenced on or about November 19, 1980. LME documentation shows that cash was received in the account on November 10, 1980, and that trading activity in a strategic metal was initiated on November 10, 1980. (2) Commissions. LME had a normal business *603 practice of charging commissions on commodity trades. Commissions charged by LME are separately stated on documents entitled "Difference Account." For example, this was done for a July 1984 gold transaction. However, there are no separately stated commissions on petitioners' exhibits for the gold and platinum trades in 1980 and 1981. Petitioner's accounting and administrative manager, John Mackowski, never asked LME what, if any, the commissions were for the trades at issue. In contrast, petitioner had made inquiries about commissions in connection with his other dealings with LME. For example, on May 6, 1981, petitioner inquired about the commission for forward contracts of silver, and on April 9, 1984, petitioner made another inquiry about commissions on forward contracts. (3) Confirmations. LME had a normal business practice of generating a document entitled "Confirmation of Contract" to confirm its commodity trades. Confirmations for other transactions were maintained by petitioner and are in the record. However, the record includes no confirmations of the 1980 or 1981 gold or platinum transactions. (4) Inquiries. Petitioner made numerous Telex inquiries to *604 LME about commodities prices. The record includes copies of 78 such inquiries and replies. None are for gold or platinum prices for the contracts at issue here. Petitioner's accounting and administrative manager acknowledged that inquiries into gold or platinum prices were never made. 5. WOCOM and TIFA Transactions With LME
WOCOM Commodities Limited (WOCOM) was organized in 1975 and was a founding member of the Hong Kong Futures Exchange Limited. It is the exclusive Hong Kong agent for Rudolph Wolf & Co., one of the largest metals dealers in the world with many international clients, including LME. TIFA is a Liechtenstein corporation incorporated in 1927 that has engaged in a wide range of investment activities including commodities since that date. David Mitchell has been a director of TIFA since 1964, when he acquired the company for his family. He has full authority to operate on behalf of the company and enter into transactions. TIFA has no ownership interest in or control over LME. Before the trial of this case, counsel for both parties were present in London for the deposition of Paul Gleeson by written questions. David Mitchell was deposed in Brussels *605 by written questions. The record includes LME confirmations to TIFA and WOCOM for gold and platinum trades during 1980 and 1981. The TIFA and WOCOM transactions tended to mirror those of petitioner. For example, around the time petitioner bought long platinum, TIFA or WOCOM bought short platinum in similar quantities. 6. Petitioner's LME Margin Activities
On November 19, 1980, petitioner made an initial margin deposit of $ 60,000 in connection with the 1980 gold/platinum spread. The 1980 transactions were closed in 1982 at a loss of $ 19,980. That amount was subtracted from petitioner's margin accounts. Thus the net fee charged by LME was $ 19,980 for the 1980 transactions. The amount of 1980 losses generated from these transactions was $ 498,450. This is a tax deduction to cost ratio of 24.95 to 1. On April 16, 1981, petitioner made an additional margin deposit of $ 60,000 in connection with the 1981 platinum/gold spread. The 1981 transactions were closed in 1983 at a loss of $ 40,000. Thus, the net fee charged by LME for the 1981 transactions was $ 40,470. The amount of 1981 losses from these transactions was $ 1,001,670. This is a tax deduction to cost ratio of 24.75 to 1. Petitioner made certain other margin deposits for his dealings with LME which are not at issue here. Petitioner ordinarily made margin deposits in advance of any margin call in order to maintain a positive equity balance in the Thurner accounts for trading flexibility. On the few occasions that market conditions required a margin call, funds were deposited immediately. For example, on February 28, 1983, LME made a margin call for $ 4,000,000, which was deposited in cash by wire transfer within 24 hours. At no time during the period from November 1980 to December 1982 were the aggregate of petitioner's personal accounts in a deficit equity position, except to the possible extent of outstanding margin calls which were timely met by petitioner.
7. Tax Treatment of Spreads/Straddles
Petitioner relied primarily on Mr. Mackowski for tax advice. Petitioners' 1980 and 1981 tax returns were prepared by John Foley. Petitioner relied on John Foley in connection with tax return preparation. John Foley is an independent CPA who worked primarily through Mr. Mackowski with respect to petitioners' returns. Petitioner personally met Mr. Foley once or twice. The *606 record does not show what information was provided to the tax preparer. When a tax question arose, Mr. Mackowski would check with Mr. Foley, and, on occasion, a tax attorney. Petitioners timely filed joint Federal income tax returns for taxable years 1980 and 1981. On their 1980 return, petitioners claimed an ordinary loss of $ 498,450 for "liquidated damages for contract cancellation." This reduced their 1980 adjusted gross income as shown on their 1980 return from $ 2,380,020, to $ 1,881,570. On their 1981 return, petitioners claimed an ordinary loss of $ 1,001,670 for "liquidation damages contract." This reduced their 1981 adjusted gross income as shown on their 1981 return, from $ 1,407,363 to $ 405,693. Their total tax liability as shown on their 1981 tax return was $ 51,138. Without the loss from the 1981 transaction at issue, petitioners' tax liability would have been $ 563,190. Respondent sent a notice of deficiency to petitioners on December 29, 1986, in which the ordinary losses for their damages were disallowed for both years. OPINION 1. Preliminary Issues
a. Price Lists from American Board of Trade
At trial certain American Board of Trade *607 (ABT) price lists that had been published in the Wall Street Journal were admitted into evidence. Petitioner objected on grounds that the information is irrelevant and inadmissible hearsay evidence. Respondent argued that it is relevant. Respondent relies upon the market quotations exception to the hearsay rule which provides that "market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or persons in particular occupations" are an exception to the hearsay rule. Fed. R. Evid. 803(17). Both parties renewed their positions in their briefs. The ABT data was noted in Forseth v. Commissioner, supra at 157. See also Wolcher v. United States, 200 F.2d 493, 498-499 (9th Cir. 1952). However, we do not use the data to reach our result here, so we do not reach this issue. b. Leads Doctrine and Burden of Proof
At trial petitioners raised the so-called "leads doctrine," citing Holland v. United States, 348 U.S. 121 (1954), and Lenske v. United States, 383 F.2d 20 (9th Cir. 1967). The thrust of petitioners' argument is that respondent's *608 agent had not followed all leads, and thus has performed his duties improperly. Because of this, petitioner argues that the burden of proof should be placed on respondent. The leads doctrine was designed to ensure that a person is not convicted of a crime where the method used to prove income is indirect and reasonable leads are not investigated. Holland v. United States, supra. It places a duty on the government in criminal cases to follow up reasonable leads furnished by the taxpayer. Holland v. United States, supra at 135; United States v. Marabelles, 724 F.2d 1374, 1379 (9th Cir. 1984); United States v. Normile, 587 F.2d 784 (5th Cir. 1979); United States v. Boulet, 577 F.2d 1165 (5th Cir. 1978), cert. denied 439 U.S. 1114 (1979); United States v. Lawhon, 499 F.2d 352, 356-357 (5th Cir. 1974), cert. denied 419 U.S. 1121 (1975); United States v. Slutsky, 487 F.2d 832 (2d Cir. 1973), cert. denied 416 U.S. 937 (1974); United States v. Suskin; 450 F.2d 596, 598 (2d Cir. 1971); United States v. Shavin, 320 F.2d 308, 311 (7th Cir. 1963), *609 cert. denied 375 U.S. 944 (1963); United States v. Nemetz, 309 F. Supp. 1336, 1339 (W.D. Pa. 1970), affd. 450 F.2d 924 (3d Cir. 1971), cert. denied 405 U.S. 988 (1972); Swallow v. United States, 307 F.2d 81, 84 (10th Cir. 1962), cert. denied 371 U.S. 950 (1963). The leads doctrine is not applicable here because an indirect method of proving income is not at issue. Thus, we hold that the burden of proof remains with petitioners in this civil case where specific deductions are identified. c. Evidence from Forseth v. Commissioner, supra
Respondent argues that certain evidence admitted at the trial of Forseth v. Commissioner, supra, should be admitted in this case. These documents were marked for identification at trial and authenticated by respondent's witness, but not admitted. This issue was briefed by the parties. Petitioners object on relevance grounds. Respondent argues that the documents are relevant to show that LME does not engage in solely legitimate transactions and to provide examples of transactions found to be factual shams. We do *610 not consider the documents at issue to decide this case. Thus, we do not need to reach this issue. We may, however, take judicial notice of our published opinion in that case. Fed. R. Evid. 201(c); see Funk v. Commissioner, 163 F.2d 796 (3d Cir. 1947); Sydnes v. Commissioner, 74 T.C. 864, 868 n.5 (1980), affd. 457 F.2d 369 (9th Cir. 1972); Kasey v. Commissioner, 54 T.C. 1642 (1970); Ambassador Hotel Co. of Los Angeles v. Commissioner, 32 T.C. 208, 216 (1959), affd. 280 F.2d 303 (9th Cir. 1960); Cumberland Portland Cement Co. v. Commissioner, 29 T.C. 1185 (1958); see also Levy v. Commissioner, T.C. Memo. 1987-609 affd. without published opinion 884 F.2d 574 (5th Cir. 1989). 2. Authenticity of the Transactions
The next issue for decision is whether the transactions here were factual shams. Deductions are strictly a matter of legislative grace and petitioners bear the burden of proving that they are entitled to any deductions claimed on their return. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); *611 Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). Both parties agree that LME has engaged in legitimate commodities transactions on behalf of customers, and both agree that LME has been a party to factual shams patterned after legitimate transactions, such as those described in Forseth v. Commissioner, supra. LME inspired, designed, and executed gold and platinum straddles that we previously found to be factual shams. Forseth v. Commissioner, supra . Respondent contends, and petitioners deny, that these transactions are factual shams. Numerous significant circumstantial facts support respondent's view. LME had a business practice of generating a document called "Confirmation of Contract" to confirm commodity trades. The record includes numerous such confirmations, but none for the transactions at issue. LME's lack of confirmation copies, unlike copious documentation provided for other trades for petitioner, suggests these trades did not occur. LME charged commissions documented in a "Difference Account" statement. The record does not include any separately stated commissions for the transactions at issue. *612 None of petitioners' witnesses, including petitioner, knew how much in commissions was paid for the subject transactions. One of petitioners' witnesses calculated what he believed the commissions should have been, but acknowledged that commissions for the gold and platinum trades at issue were not separately stated. The lack of documentation stating commissions for these transactions, unlike for their other trading, suggests they were not actual transactions. The record includes numerous Telex messages between petitioner and LME concerning prices and movement of commodities, such as strategic metals and silver, but does not include gold or platinum. Mr. Mackowski testified that he could not recall whether he obtained from LME gold or platinum prices on the exchange for market value purposes. Petitioner's lack of inquiries to LME about gold and platinum prices, in marked contrast to petitioner's frequent inquiries about other investments with LME, suggests there was something fundamentally different about them. We note that petitioner's accounting and administrative manager said they could obtain these prices elsewhere, but that doesn't adequately explain why they refrained from *613 making inquiry to LME about these transactions. There are other irregularities in LME paperwork. One example is that LME records state the account for the 1980 transactions was opened on November 10, 1980, while it was actually opened on November 19, 1980. Also, in 1986 petitioner purchased cadmium. LME sent petitioner a confirmation of the purchase. Later it was shown LME made no such purchase. Another circumstantial fact that casts doubt on the transactions is that there is a striking pattern between petitioner's cost for the transactions and the first year losses provided. For 1980 the ratio between first-year loss and petitioner's cost is 24.75 to 1; for 1981 the ratio is 24.95 to 1. In Forseth v. Commissioner, supra, the Court noted a "remarkable correlation between the tax needs of each petitioner * * * and the nature and amount of tax losses delivered by LMEI/LMEC and InterAct." 85 T.C. at 152. Their losses as a percentage of adjusted gross income ranged from 55 percent to 94 percent. Here it was 20.94 percent for 1980 and 71.17 percent for 1981. We note that here petitioner did not deal with InterAct, the United States based firm *614 that brought the Forseth taxpayers (except Mr. Bramblett) to LME. However, we believe LME is perfectly able to conduct factual shams without InterAct. In Forseth, we held a factual sham for Mr. Bramblett who did not utilize InterAct. As that opinion stated, the real role of LMEI/LMEC was to contrive and/or manipulate an unregulated and unpublished market in gold and platinum forward contracts so that it could deliver to its investors the losses promised by its fee-splitting American liaison, InterAct. After a careful review of the facts, we must conclude that the transactions before us were factual shams, inspired, designed, and executed by LMEI/LMEC, with the participation of InterAct, for the sole purpose of achieving for its investors capital and ordinary losses to offset their unrelated income in 1980 and 1981. * * * (85 T.C. at 165.) Petitioners argue that here, unlike in Forseth, they did not give a power of attorney to LME. We do not believe the presence or absence of a power of attorney controls the issue as to whether the transactions were factual shams. Petitioners also argue that the record here includes evidence of the opposite *615 sides for their trades. Petitioners argue that proof of the reality of their gold and platinum trades for 1980 and 1981 is shown by the evidence that WOCOM and TIFA acquired positions which generally mirrored petitioner's trades. We do not believe these records make petitioners' point. These records show positions held by TIFA and WOCOM; they do not necessarily establish any connection to positions held by petitioner. Paul Gleeson said that TIFA and WOCOM purchased the offset positions from those purchased by petitioner. Gleeson said that when petitioner wanted to open a position, he went to TIFA or WOCOM to negotiate the purchase of the opposite position. He also said that whenever petitioner wanted to close out a position, he went back to TIFA or WOCOM to negotiate a price for "canceling" the transaction. Mr. Mitchell did not say that TIFA negotiated a cancellation or the previous contracts in the manner described by Gleeson. He was not asked to do so in the written interrogatories propounded by petitioners' counsel. Mitchell's deposition does not establish that TIFA held the opposite side of petitioner's (as opposed to someone else's) trades. Absent corroboration by *616 the records themselves or Mitchell, the Gleeson deposition does not convince us that TIFA or WOCOM specifically held the opposite sides of petitioner's trades. Respondent's agent testified that it would be impossible for a broker to look back in the business books at the transactions and determine who had the opposite side of one's transactions and petitioner did not convince us otherwise. 3. Profit Motive and Section 108 of the Deficit Reduction Act of 1984 as Amended
Petitioners argue that the deductions from these transactions are allowed under section 108(a) of the Deficit Reduction Act of 1984, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-154, 100 Stat. 2817. Freytag v. Commissioner, 89 T.C. 849, 884-885 (1987), affd. 904 F.2d 1011 (5th Cir. 1990); Glass v. Commissioner, supra at 1167; Smith v. Commissioner, 78 T.C. 350, 394 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987); and Fox v. Commissioner, 82 T.C. 1001, 1021 (1984). Petitioners argue that the gold and platinum transactions were entered into primarily for profit. *617 They also argue that we should allow the losses because the transactions had a reasonable potential for making a profit. Respondent contends that the transactions were not entered into primarily for profit. Respondent opposes the profit potential standard sought by petitioners, but argues that even if it is applied, petitioners did not meet it. Section 108 of the Deficit Reduction Act of 1984 (section 108), as amended by section 1808(d) of the Tax Reform Act of 1986, provides in pertinent part: Sec. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981. (a) General Rule. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions --
(1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply, any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. *618 (b) Loss Incurred in a Trade or Business. -- For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business. * * * (e) Straddle. -- For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1954 as in effect on the day after the date of the enactment of the Economic Recovery Tax Act of 1981, and shall include a straddle all the positions of which are regulated futures contracts. (f) Commodities dealer. -- For purposes of this section, the term "commodities dealer" means any taxpayer who --
(1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), or * * * (g) Regulated Futures contracts. -- For purposes of this section, the term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Internal Revenue Code of 1954 (as in effect before the date of enactment of this Act). (h) *619 Syndicates. -- For purposes of this section, any loss incurred by a person (other than a commodities dealer) with respect to an interest in a syndicate (within the meaning of section 1256(e)(3)(B) of the Internal Revenue Code of 1954) shall not be considered to be a loss incurred in a trade or business. a. Primarily for Profit Standard Applies
Commodities spread or straddle transactions must be entered into primarily for profit for losses to be deductible under section 108(a) of the Deficit Reduction Act of 1984, as amended by section 1808(d) of the Tax Reform Act of 1986. Ewing v. Commissioner, 91 T.C. 396, 417 (1988); Boswell v. Commissioner, 91 T.C. 151, 159 (1988); Glass v. Commissioner, supra; Fox v. Commissioner, 82 T.C. 1001 (1984); Smith v. Commissioner, supra.
A straddle transaction is "entered into for profit" within the meaning of section 108(a) if it meets the "primarily for profit" standard applicable to losses under section 165(c)(2). Ewing v. Commissioner, supra at 416; Boswell v. Commissioner, 91 T.C. at 158-159. *620 In Ewing v. Commissioner, supra at 417-418, a case involving an investor in a gold straddle in a highly regulated market, we said: In determining whether a straddle transaction is entered into primarily for profit, Fox provides the following additional guidelines: (1) The ultimate issue is profit motive and not profit potential. However, profit potential is a relevant factor to be considered in determining profit motive. 82 T.C. at 1021. (2) Profit motive refers to economic profit independent of tax savings. 82 T.C. at 1022. (3) The determination of profit motive must be made with reference to the spread positions of the straddle and not merely to the losing legs, since it is the overall scheme which determines the deductibility or nondeductibility of the loss. 82 T.C. at 1018, citing Smith v. Commissioner , 78 T.C. at 390-391. (4) If there are two or more motives, it must be determined which is primary, or of first importance. The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent. 82 T.C. at 1022. *621 (5) Because the statute speaks of motive in "entering" a transaction, the main focus must be at the time the transactions were initiated. However, all circumstances surrounding the transactions are material to the question of intent. 82 T.C. at 1022. In Yosha v. Commissioner, 861 F.2d 494, 499 (7th Cir. 1988), affg. 87 T.C. 1087 (1986), the Seventh Circuit Court of Appeals, the Circuit to which this case is appealable, described the "for profit" requirement as follows: *622 [Options straddles] enable investors to speculate in this riskiest of markets without assuming the full market risk. The investor can hedge as much as he likes. The more he hedges, the smaller his risk either of gain or of loss. Although such transactions have economic substance even when the investor would not have engaged in them but for the tax advantages they offer, losses incurred in them are deductible from ordinary income only if they also satisfy the express statutory test applicable to loss deductions from ordinary income. The transactions must have been entered into "for profit," a term that has been interpreted to require that the "nontax profit *623 motive predominates." Miller v. Commissioner, 836 F.2d 1274, 1279 (10th Cir. 1988). Yosha v. Commissioner, supra at 499. b. Profit Potential Standard
Petitioners suggest, however, that whether the transaction was entered into for profit should be measured by profit potential rather than profit motive. We note that the two tests are not mutually exclusive. The amount of profit potential is considered in deciding profit motive. Fox v. Commissioner, 82 T.C. at 1021. In determining whether a straddle or spread transaction is entered into primarily for profit, the ultimate issue is profit motive and not profit potential. Ewing v. Commissioner, supra at 417-418; Fox v. Commissioner, supra at 1021. The Seventh Circuit has recently applied the primarily for profit motive test in Yosha v. Commissioner, supra, affirming Forseth v. Commissioner, but noting that: Despite this growing phalanx of authority, the objective test, strongly urged by the taxpayers in this case, has much to recommend it. Judges can't peer into people's minds or "weigh" *624 motives * * * 861 F.2d at 501. In Boswell v. Commissioner, supra, we held that losses from commodity straddle transactions entered into before June 23, 1981, are deductible if the taxpayer's primary motive for entering into the transactions was to realize an economic profit under section 108(a) of the Deficit Reduction Act of 1984, as amended by section 1808(d) of the Tax Reform Act of 1986. In Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affg. 87 T.C. 1087 (1986), the Fourth Circuit held that section 108(a) of the Deficit Reduction Act of 1984 incorporated the "primarily for profit" test. See also Miller v. Commissioner, 836 F.2d 1274 (10th Cir. 1988), revg. 84 T.C. 827 (1985); Landreth v. Commissioner, 859 F.2d 643 (9th Cir. 1988), affg. in part and revg. in part and remanding T.C. Memo. 1985-413. Petitioners urge us to reject Boswell v. Commissioner, supra, and the line of cases that followed it, and to adopt an objective test or profit potential test. Specifically, petitioners suggest that where the transaction *625 is authentic and there is profit potential, the taxpayer should be deemed to satisfy the entered into for profit test under section 108(a). We decline to do so. Accordingly, we must decide whether these transactions were entered into primarily for profit, or whether they were primarily tax motivated. c. Application of Primarily for Profit Standard
As discussed below, we are not convinced that petitioners entered into the transactions at issue here primarily for profit. Petitioners argue that they entered into these transactions primarily for profit, but they do not deny considering the tax aspects of the transactions. Their evidence consists primarily of a large volume of other transactions not challenged by respondent and petitioner's testimony that the transactions at issue were entered into primarily for profit. At trial petitioner testified: What I do is, I look at a deal and analyze the deal, and if the deal looks good, whatever tax consequences come, that's just a dividend to you. It makes the deal better. and If it doesn't make economic sense you just don't go into it -- forget about taxes. Petitioner denied knowing that there was any special *626 tax reason for holding an investment six months and one day before selling, and he denied awareness that a commodity transaction he conducted in May 1981, was done two days before an effective date of a commodities tax reform. He denied that he considered that he would get a one-half million dollar tax loss for 1980 or a one million dollar tax loss for 1981 when he canceled the loss legs. Based on his detailed, hands-on, approach to operating his varied business and investment activities, we think he understated his awareness and consideration of tax factors. Greater weight should be given to the objective facts than to petitioner's self-serving testimony regarding intent. Fox v. Commissioner, supra at 1022; Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Petitioner's objective conduct shows that he wanted to obtain tax losses for 1980 and 1981 in transactions designed to be virtually devoid of risk. We believe that is why he sold his long *627 platinum and gold positions each of those years shortly after buying them, and then replaced them with long gold and platinum positions. The objective facts in this record show petitioners' primary motive in these transactions was to obtain tax losses, and do not show petitioners' primary motive to be profit. Petitioner has entered into many other transactions primarily for profit over a period of many years, including the years at issue here. However, it does not necessarily follow that the trades at issue were entered into for primarily profit. We treat these transactions differently from petitioner's other trades in part because petitioner himself treated them differently. For example, he made frequent inquiries about his other trades, but not these. He received written confirmations of his other trades. In his other trades we have no reason to believe that he canceled a forward contract or sold a loss leg almost immediately after buying it to "cut his losses," replaced it immediately with a substitute position, and then held the hedged position into the second succeeding tax year, as he did here. After selling the loss legs, petitioner held the new balanced positions *628 in the 1980 gold straddle and 1981 platinum straddle for about 14 months, and about 20 months, respectively. Nowhere else in the record is it shown that petitioner held a commodity straddle or spread position for so long. Generally, they were held by petitioner for no longer than nine months. Petitioner anticipated large gross income in 1980 and 1981. He reported a $ 5 million profit from the sale in 1980 of an oil company of which he was chairman of the board. Petitioner entered into the gold and platinum transactions from November 21, 1980, to December 1, 1980. He canceled the loss legs from December 10, 1980, to December 12, 1980. The profit from the sale of the oil company and the timing of the transactions are strong evidence of petitioner's interest in obtaining approximately a half-million dollar ordinary loss write off. In 1981, petitioners had $ 1,538 in income from pensions, $ 1,538,133 from annuities, and $ 622,796 from interest. The $ 225,417 petitioners prepaid in estimated tax for taxable year 1981, shows they believed they would be liable for substantial tax. The ordinary loss of $ 1,001,670 for the contracts reduced petitioners' total tax liability to $ 51,138 *629 as shown on their 1981 return from $ 563,190. The timing of the transactions, the manner in which they were conducted, petitioner's use of an unregulated foreign market, and the tax loss to cost ratios indicate tax motivation was in reality the primary motive. Petitioners argue that the instant case is identical to Laureys v. Commissioner, 92 T.C. 101 (1989). We disagree. Laureys is distinguishable on several grounds. First, in Laureys, respondent conceded that the transactions, conducted on the highly regulated Chicago Board of Options Exchange, were not factual shams. Second, the taxpayer in Laureys was a full-time dealer and member of both the Chicago Board of Options Exchange and the Chicago Board of Trade. Here, petitioner was an investor. In that regard this case is more like Boswell v. Commissioner, supra, where the taxpayer was an investor, not a dealer, who entered into commodity straddles and claimed ordinary losses. There, we held that the taxpayer entered into T-bill straddles that had the potential to realize a modicum of economic profit, but the transactions were not entered into with the primary motive to derive *630 an economic profit. Boswell v. Commissioner, 91 T.C. at 153. Third, we did not deal with balancing dual motives in Laureys. We concluded that the taxpayer there had a primary purpose to make a profit. Laureys v. Commissioner, supra at 133-134. Here, we conclude that petitioner had no such primary purpose. Thus, even if there was any profit motive here, we must deal with balancing dual motives. In Fox v. Commissioner, supra, we examined dual motives and stated: The language of section 165(c)(2) does not specify the degree of profit motive necessary to support a section 165(c)(2) loss deduction. An incidental profit motive is insufficient. Ewing v. Commissioner, 20 T.C. 216, 233 (1953), affd. 213 F.2d 438 (2d Cir. 1954). At the other extreme, it requires no citation of authority to state as well that profit need not be the sole motive. When a taxpayer enters a particular transaction with the mixed motives of obtaining a profit and obtaining tax benefits, the question exists whether profit motive must be the primary motive to satisfy section 165(c)(2), or whether the profit motive *631 may be merely significant or substantial. For the purposes of this case, we proceed on the supposition, without deciding, that petitioner had some profit motive. The "primary" standard first appeared as a judicial gloss on the statutory language of section 165(c)(2) in Helvering v. National Grocery Co., 304 U.S. 282 (1938). The case was unrelated to section 165(c)(2) and the reference to section 23(e) (predecessor to section 165(c)(2)) was made in order to support the proposition that "The instances are many in which purpose or state of mind determines the incidence of an income tax." 304 U.S. at 289. In a footnote, the Court cited examples and included the following sentence: "Similarly, the deductibility of losses under section 23(e) * * * may depend upon whether the taxpayer's motive in entering into the transaction was primarily profit." (304 U.S. at 289 n. 5.) Despite its rather casual genesis, the "primary" standard was echoed by a number of courts subsequently faced with cases under section 165(c)(2). In Austin v. Commissioner, 298 F.2d 583 (2d Cir. 1962), affg. 35 T.C. 221 (1960), the Second Circuit *632 reiterated the standard as follows: Petitioners contend that, since the word " primarily" does not appear in the statute, and since the Tax Court found that the transaction was entered into for profit, the deduction must be allowed. * * * But the position for which petitioners contend would not provide a workable interpretation of sec. 165. * * * In Helvering v. National Grocery Co., 304 U.S. 282, 289 note 5, 58 S. Ct. 932, 936, 82 L.Ed. 1346 (1938), the Supreme Court said: "[T]he deductibility of losses under [sec 165(c)] may depend upon whether the taxpayers' motive in entering the transaction was primarily profit." This court has repeatedly held that, in determining the deductibility of a loss, the primary motive must be ascertained and given effect. * * * [298 F.2d at 584; fn. refs. omitted; emphasis added.] Fox v. Commissioner, 82 T.C. at 1019-1020. Petitioner argues that respondent's proof is circumstantial and entitled to no weight. We again note that the burden of proof is on petitioner. We have relied on circumstantial evidence to determine profit motive. National Water Well Association, Inc. v. Commissioner, 92 T.C. 75, 88 (1989). *633 We have also relied upon circumstantial evidence to determine tax avoidance as a principal purpose for certain conduct. Your Host, Inc. v. Commissioner, 58 T.C. 10 (1972). Even in fraud cases reasonable inferences may be drawn from the facts because direct proof of the taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Petitioners' complaint is without merit. Petitioners have not argued that petitioner was a commodities dealer. Thus, the exception for commodities dealers under section 108(b) of the Deficit Reduction Act of 1984 as amended does not apply in this case. d. Conclusion
On balance, after review of the entire record, we find that petitioner had no more than an incidental interest in potential economic gain, and that his primary motive for entering into the transactions at issue was tax avoidance. Therefore, pursuant to our holdings in Smith, Fox, Glass, and Freytag, we find that petitioners have not shown the requisite profit motive. Accordingly, section 108(a) does not allow the deductions at issue. In *634 light of the foregoing, we hold that petitioners are not entitled to deduct amounts for liquidated damages due to cancellation of the loss legs of the gold/platinum spreads at issue. We sustain respondent's determination as to this issue. 4. At Risk
Petitioners argue that the at risk limits of section 465(b)(4) do not apply here. Section 465(b) limits a taxpayer's deduction of losses from an activity to the extent that he or she is at risk for the investment. Sec. 465(b)(1). A taxpayer is considered at risk for the amount borrowed for which he or she is personally liable. Sec. 465(b)(1) and (2). Amounts borrowed do not include amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. Sec. 465(b)(4). Petitioners correctly point out that we have held that offsetting positions in options do not constitute "a similar arrangement" under section 465(b)(4). Laureys v. Commissioner, 92 T.C. 101, 131-132 (1989). However, there is a significant difference between the instant case and Laureys. Here, there was a stop-loss agreement of $ 108,000 for $ 1.8 million of gold and platinum *635 trading, evidenced by the November 19, 1980 letter to petitioner from James Gourlay of LME. In the absence of any explanation to the contrary, we take it to apply to all of the 1980 gold and platinum positions at issue here. There was no stop loss agreement in Lauryes. We hold that the stop loss agreement limits petitioners' 1980 losses from these transactions to $ 108,000 for 1980. Respondent also argues that if the transactions are found not to be factual shams and to have been engaged in primarily for profit, that the resulting losses are capital losses, not ordinary losses. In light of our holding on the other issues here, we need not reach this issue. 5. Additions to Tax and Increases to Interest
a. Negligence
Respondent determined that petitioners are liable for the additions to tax for negligence under section 6653(a) for 1980. Section 6653(a) imposes an addition to tax equal to five percent of the underpayment if any part of any underpayment is due to negligence or intentional disregard of rules and regulations. Respondent also determined that petitioners are liable for the additions to tax for negligence under sections 6653(a)(1) and (2) for *636 1981. Section 6653(a)(1) imposes an addition to tax equal to five percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2)(2) imposes an additional liability of 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that respondent's determination that they were negligent or intentionally disregarded the rules and regulations for each of the years in issue was erroneous. Warrensburg Board & Paper Corp. v. Commissioner, 77 T.C. 1107, 1112 (1981); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). For purposes of these sections, "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985), citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299. Petitioners argue that they *637 were not negligent because: (1) petitioners have not disregarded the "at risk" rules; (2) petitioners have substantial authority that their losses were ordinary rather than capital; (3) petitioners satisfy the subjective and objective "for profit" tests; (4) respondent had conceded two issues; and (5) under Forseth v. Commissioner, 85 T.C. 127 (1985), and other analysis petitioners were not negligent. We disagree that petitioners have substantial authority for their position. In fact, the case law is overwhelmingly against their position. As discussed above, we find that petitioners fail to satisfy the "for profit" requirement. Respondent's concessions are irrelevant to this issue because the test is whether or not any part of the underpayment is due to negligence. Petitioners' attempts to contrast the facts of Forseth v. Commissioner, supra, with the instant case are not compelling. It does not logically follow that facts different from a case where negligence is found necessarily result in the absence of negligence in the instant case. Petitioners also contend that they were not negligent because they relied upon the opinions of two *638 professional advisers. Good faith reliance on the advice of counsel or a qualified accountant can be, under certain circumstances, a defense to the addition to tax for negligence. See, e.g., Ewing v. Commissioner, 91 T.C. at 423-424; Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968); see also United States v. Boyle, 469 U.S. 241, 250-251 (1985). We rejected the taxpayers' reliance defense to negligence in Forseth v. Commissioner, supra at 167. We have also held taxpayers liable for additions to tax for negligence when they argued as a defense reliance on an attorney, accountant, tax adviser, or tax return preparer where there was no showing of the information that the taxpayer gave to the adviser. Enoch v. Commissioner, 57 T.C. 781, 803 (1972); Pessin v. Commissioner, supra; Lester Lumber Co. Inc. v. Commissioner, 14 T.C. 255, 263 (1950). Generally, the duty to file *639 an accurate return cannot be avoided by placing responsibility on an agent. Enoch v. Commissioner, supra at 802. In this case petitioners argue that they relied upon the professional advice of their employee, John Mackowski, petitioners' accounting and administrative manager, and John Foley, an independent certified public accountant who worked under John Mackowski and who prepared the tax returns. Petitioners did not provide any evidence as to the information that they gave to their return preparer. [3] We can only surmise as to the information petitioners may have provided to their accountants and lawyers. Instead, petitioners make general allegations supported by self-serving testimony. Accordingly, we do not know what information and documents petitioners' accountants were given to prepare these returns. Without evidence of the information provided to their return preparer, we are unable to evaluate petitioners' reliance. *640 Petitioners rely on Ewing v. Commissioner, supra, and Jackson v. Commissioner, supra, in support of their reliance claim. However, those cases are distinguishable. In Ewing, the taxpayers read and in good faith relied upon a tax opinion provided by an attorney whom the taxpayer knew and successfully relied on for 10 years. Ewing v. Commissioner, supra at 423. Likewise, in Jackson, the taxpayers relied upon the legal opinion of competent tax counsel. Here, petitioners contend they relied upon their employee, John Mackowski, and their tax preparer, John Foley. Under the circumstances of this case, we believe petitioners' reliance on these persons was unreasonable. We believe that subject to concessions, that the entire underpayment is due to negligence or intentional disregard of rules and regulations. We therefore sustain respondent's determination as to this issue and hold that petitioners are liable for additions to tax for negligence. b. Increased Interest
Respondent determined that petitioners are liable for additional interest on an underpayment attributable to a tax-motivated transaction as defined in *641 section 6621(c). [4]
*642 Petitioners argue that this increased interest rate should not apply because the subject transactions were not factual shams, had economic substance, and were entered into for profit. Section 6621(c) (formerly section 6621(d)) provides for an increase in the interest rate where there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." Section 6621(c)(3) defines tax-motivated transactions to include "any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092)," sec. 6621(c)(3)(A)(iii), and "any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period." Sec. 6621(c)(3)(A)(iv). The increased interest rate is effective as to interest accruing after December 31, 1984 (the date of enactment of the original section 6621(d)), even though the tax-motivated transaction was entered into prior to that date and "regardless of the date the return was filed." H. Rept. 98-861 (Conf.), 1984-3 C.B. (Vol. 2) 239; Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), *643 affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent conceded the 1980 adjustment for origination fees in the amount of $ 4,190, and contends that the remaining deficiency is tax motivated as a distorting accounting method or a straddle. Section 6621(c)(3)(B) provides that the Secretary may add, by regulation, certain transactions that will be treated as tax-motivated transactions. In a case involving section 6621(d) (the predecessor to section 6621(c)), respondent's regulations thereto, and transactions not entered into for profit, we said: respondent's temporary regulations treat as a tax-motivated transaction "any deduction disallowed for any period under section 165(c)(2) relating to any transaction not entered into for profit." Sec. 301.6621-2T, Q-4 and A-4, Proced. & Admin. Regs. (Temporary), T.D. 7998, 1985-1 C.B. 368, 49 Fed. Reg. 59394 (Dec. 28, 1984). [Fn. ref. omitted.] As part of our holding that the transactions lack economic substance, we have explicitly found that the disputed transactions were not entered into for profit. The losses from such transactions are thus not allowable under section 165(c)(2). Accordingly, *644 we also find that pursuant to respondent's temporary regulations, the interest rate under section 6621(d) [now section 6621(c)] is applicable to the underpayments attributable to such disallowed losses. * * * Patin v. Commissioner, 88 T.C. 1086, 1129 (1987), affd. without opinion Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988) affd. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), (disagreed with by Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), affd. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). As discussed above, we have found that the transactions at issue here were primarily tax-motivated transactions and not entered into for profit. Accordingly, we sustain respondent's determination as to this issue and hold that the increased interest under section 6621(c) applies. c. Frivolous Suit Instituted Primarily For Delay
For positions taken after December 31, 1989, in proceedings which are pending on, or commenced after such date, the Court may award a penalty (formerly damages) not in excess of $ 25,000 (formerly $ 5,000) when proceedings have been instituted *645 or maintained primarily for delay, where the taxpayer's position is frivolous or groundless, or where the taxpayer unreasonably fails to pursue available remedies. Section 6673(a)(1). Prior law is applicable to this case. Based on the entire record, we hold that petitioners are not liable for damages under section 6673. To reflect concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. We use the term "gold and platinum spread" to refer to the purchase of forward contracts or futures in two different commodities, i.e., gold and platinum, in a hedged position comprised of two substantially offsetting positions.↩
3. See Samp v. Commissioner, T.C. Memo. 1981-706↩.
4. Section 6621(c) provides in pertinent part: (c) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- (1) In General. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) Substantial Underpayment Attributable to Tax Motivated Transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. (3) Tax Motivated Transactions. -- (A) In General. -- For purposes of this subsection, the term "tax motivated transaction" means - * * * (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, * * *↩