T.C. Memo. 1997-414


UNITED STATES TAX COURT


ALAN M. RESSER AND MELINDA B. RESSER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent<sup>*</sup>


Docket No. 18606-88.    Filed September 18, 1997.


<u>Steven D. Blanc</u>, for petitioner Melinda B. Resser.

<u>Joseph T. Ferrick</u>, for respondent.


SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION


WRIGHT, <u>Judge</u>:  This matter is before the Court on remand
from the Court of Appeals for the Seventh Circuit.  <u>Resser v.
Commissioner</u>, 74 F.3d 1528 (7th Cir. 1996), revg. and remanding
T.C. Memo. 1994-241.

---

<sup>*</sup> This opinion supplements <u>Resser v. Commissioner</u>, T.C.
Memo. 1994-241, revd. and remanded 74 F.3d 1528 (7th Cir. 1996).

Petitioners filed a joint Federal income tax return for taxable year 1982. Respondent determined a deficiency in petitioners' 1982 Federal income tax in the amount of $391,113, and an addition to tax under section 6661[1] in the amount of $97,778.50. Respondent also determined that petitioners were liable for an increased rate of interest pursuant to section 6621(c) due to a substantial underpayment attributable to a tax-motivated transaction. The deficiency, addition to tax, and increased interest relate solely to Alan M. Resser's stock option trades.

The primary issue presented at trial was whether losses from Alan M. Resser's stock option spread transactions should be disallowed because the transactions were not entered into for profit. After trial, in Resser v. Commissioner, T.C. Memo. 1991-423 (Resser I), we held that the losses generated by Alan M. Resser's stock option trades were not deductible under section 165 because Mr. Resser lacked the requisite profit motive. Consequently, we sustained respondent's determinations with respect to the deficiency, addition to tax, and increased rate of interest.

Prior to trial of Resser I, Melinda B. Resser filed a Motion to Sever Issue of Innocent Spouse. We granted the motion, and a

---

[1] All section references are to the Internal Revenue Code in effect for the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

separate trial was held in Chicago, Illinois, on the issue of whether Melinda B. Resser qualifies for relief under the innocent spouse provision of section 6013(e).

In Resser v. Commissioner, T.C. Memo. 1994-241 (Resser II), we concluded that Melinda B. Resser did not qualify as an innocent spouse because she did not satisfy section 6013(e)(1)(C) and (D), two of the four requirements of the innocent spouse relief provision.  Because we found that Melinda B. Resser did not satisfy the requirements of section 6013(e)(1)(C) and (D), we did not address whether the understatement resulted from a grossly erroneous item, as required by section 6013(e)(1)(B).

On appeal, the Court of Appeals for the Seventh Circuit reversed our decision and held that Melinda B. Resser did satisfy section 6013(e)(1)(C) and (D).  The Court of Appeals remanded the case to this Court solely to determine whether Melinda B. Resser satisfies section 6013(e)(1)(B).  The parties agree, and we have found that, for taxable year 1982, petitioners filed a joint return and that there was a substantial understatement of tax attributable to Alan M. Resser.  Consequently, the issue before us is whether the substantial understatement is attributable to grossly erroneous items.  For the reasons set forth below, we find that the substantial understatement is attributable to grossly erroneous items of Alan M. Resser and hold that Melinda B. Resser has satisfied section 6013(e)(1)(B).

FINDINGS OF FACT

We adopt in full the findings of fact in our prior memorandum opinions. For convenience, we repeat below some of the important findings of fact, and we make additional findings of fact. Petitioners resided in Highland Park, Illinois, at the time their petition was filed.

From 1973 through 1982, Mr. Resser was a member of the Chicago Board of Options Exchange (CBOE), a registered national securities exchange. Mr. Resser held market maker status in appointed stock options that he traded at the CBOE.[2]

During taxable year 1982, Mr. Resser executed stock option trades[3] at the CBOE in two accounts, account AMR and account QRF.[4] Account AMR was registered in the name of Bichon Venture (Bichon), an Illinois limited partnership. Mr. Resser was the managing general partner of Bichon. Account QRF was a joint account registered in the name of Mr. Resser and Rialcor Securities Corp. (Rialcor), the CBOE member firm through which

---

[2] See Resser I for detailed descriptions of both the CBOE and the market maker function.

[3] See Resser I for a discussion of the fundamentals of CBOE option trading.

[4] For the first 3 months of 1982, account QRF was designated RSR. It was changed to QRF because of a CBOE rule change. In February 1982, Mr. Resser entered into 27 option transactions on 7 different days, each involving Superior Oil (SOC) stock options. Respondent did not challenge the SOC transactions in account RSR because the transactions merely closed option positions that were open as of Dec. 31, 1981.

Mr. Resser cleared all his trading activities at all times relevant to this case. Mr. Resser was a one-third owner of Rialcor. Pursuant to an oral agreement, Mr. Resser received 90 percent of the profits and losses realized in account QRF and Rialcor received the balance.

A typical workday for Mr. Resser began with a breakfast business meeting with a co-owner of Rialcor. After the business meeting, Mr. Resser reviewed the daily trading sheets of approximately 40 traders in his performance of risk management duties for Rialcor. Next, Mr. Resser would analyze his own trading positions and prepare for the day's trading. Mr. Resser spent approximately 6-1/2 hours a day trading options for Bichon in account AMR.

The vast majority of Mr. Resser's option trading in taxable year 1982 was done for Bichon in account AMR. He engaged in trading activities with respect to account AMR on an almost daily basis. During 1982, Mr. Resser entered into transactions involving Baxter Travenol Laboratories, General Foods Corp., Honeywell, Inc., and International Business Machines in account AMR. From April 1 through December 31, 1982, Mr. Resser entered into a total of 10,077 option transactions in account AMR. For this same period, Mr. Resser entered into only 29 option transactions in account QRF, each involving Teledyne (TDY) stock options. Mr. Resser traded only TDY options in account QRF and

did not execute any TDY option transactions in account AMR. The exact amount of time spent by Mr. Resser trading for account QRF is not known, but it appears to have been de minimis.[5]

The TDY transactions executed by Mr. Resser for account QRF were known as "spreads".[6] The basic strategy of a spread transaction is utilizing one option in the spread to offset the risk of another option in a spread. Theoretically, a spread position reduces, to some extent, both risk and profit potential. This reduction in the risk and profit potential of a spread may be altered by exercise, by assignment, by offsetting a position, or through a market event affecting the underlying stock.

TDY stock prices were volatile during 1982. On September 30, 1982, Mr. Resser entered into the following TDY box spread:

| Option | Long (Short) Quantity |
|--------|----------------------|
| April 65 Call | 200 |
| April 65 Put | (200) |
| April 70 Call | (200) |
| April 70 Put | 200 |

---

[5] Mr. Resser testified that a trade could take seconds to execute.

[6] A "spread" is a position consisting of both long and short options in all puts, all calls, or a combination of puts and calls. See Resser I for an explanation of options and option trading. Though it was not explicit in the record, we infer that Mr. Resser was known at the CBOE as a "spreader", that is, a trader whose specialty was engaging in option spread transactions.

TDY stock closed at 89-3/4 on September 30, 1982. If the price of TDY stock declined from 89-3/4 to 70 or below, the September 30 box spread would be profitable.

On September 30, 1982, Mr. Resser established the following butterfly spread position:

| Option | Long (Short) Quantity |
|--------|----------------------|
| April 75 Call | 95 |
| April 80 Call | (190) |
| April 85 Call | 95 |

This butterfly spread would achieve its optimum profitability if the TDY stock price decreased to 80. The September 30 TDY stock option transactions all occurred within a 10-minute period.

On October 1, 1982, Mr. Resser established a position that could be described as a "double box" spread or as two butterfly spreads. The spread consisted of the following:

| Option | Long (Short) Quantity |
|--------|----------------------|
| Jan 65 Call | (129) |
| Jan 65 Put | 129 |
| Jan 70 Call | 258 |
| Jan 70 Put | (258) |
| Jan 75 Call | (129) |
| Jan 75 Put | 129 |

As with the September 30 spreads, the October 1 position would be able to generate profit if the price of TDY declined. The October 1 transactions were reported as having occurred within a 16-minute period.

On October 11, 13, and 14, 1982, Mr. Resser entered into 12 positions comprising 4 butterfly spreads. From these 4 spread trades, Mr. Resser closed certain positions and realized net losses in the amount of $1,121,148. A portion of these losses, $188,896, was generated on October 11, 1982, when Mr. Resser closed out the January 65 call leg from his October 1 TDY transaction. On October 13, 1982, Mr. Resser closed out an April 70 call leg from a September 30 spread and realized a $275,181 loss.

On October 14, 1982, Mr. Resser established an April 70-80-90 butterfly call spread (100 + 100 short on the wings/200 long on the body) and realized losses of $448,040. Mr. Resser also entered into a January 65-75-85 butterfly call spread that netted losses of $209,031.

Mr. Resser's net losses claimed from the few trades occurring on September 30, October 1, 11, 13, and 14, 1982, amounted to $1,121,148. Mr. Resser executed no other stock option trades in account QRF until December 17, 1982. On that date, Mr. Resser entered into a TDY spread and realized a net gain of $227,442. The December 17 spread reduced Mr. Resser's net trading losses in account QRF from $1,121,148 to $893,706. Mr. Resser's 90-percent share of the $893,706 loss equaled $804,335. After the December 17 transactions, no other trades

were executed by Mr. Resser for account QRF during the remainder of 1982.

For taxable year 1982, petitioners reported wage income of $251,413, consisting of $236,550 earned by Mr. Resser as a risk manager for Rialcor and $14,863 of compensation earned by Mrs. Resser. Mr. Resser also earned $42,975 as consulting and director fees.

For taxable year 1982, petitioners reported a $250,671 loss from stock option investments on a Schedule C attached to their Federal income tax return. Included in the Schedule C loss were $804,336 of losses and $555,176 of gains from stock option spread transactions from account QRF.[7] In addition to the $249,160 of loss ($555,176 minus $804,336), a $1,511 deduction for expenses related to Mr. Resser's trading activity was claimed, which resulted in the Schedule C net loss of $250,671.

Petitioners' 1982 taxable income was computed as follows:

| Income or Loss Item | Amount |
| --- | --- |
| Wages or salaries | $251,413 |
| Interest income | 46,843 |
| Refunds of State taxes | 3,737 |
| Schedule C loss | (250,671) |
| Schedule E loss | (28,599) |
| Consulting, director fees | 42,975 |
| | 65,698 |
| Schedule A and Schedule W deductions, exemptions | (62,172) |
| 1982 Taxable income | $ 3,526 |

---

[7] This also includes the Superior Oil Corp. gains realized in February 1982 which were not challenged by respondent.

Mr. Resser's Schedule C loss reduced petitioners' adjusted gross income significantly. Petitioners' 1982 Federal income tax liability was zero.

In the notice of deficiency, respondent disallowed Mr. Resser's account QRF TDY stock option spread losses and expenses on the basis that the transactions were "not profit motivated."

At trial, respondent contended that Mr. Resser's trades were motivated primarily by tax considerations and were a blatantly obvious attempt to offset all earned wages and other income. Petitioners argued that Mr. Resser entered into the TDY option transactions to generate a profit and that his TDY option trading constituted a trade or business. Petitioners relied on Laureys v. Commissioner, 92 T.C. 101 (1989), a case involving a registered market maker with the CBOE who engaged in TDY option spread transactions similar to Mr. Resser's TDY spreads.

In Resser I, we held that the account QRF losses were not deductible under section 165 because Mr. Resser lacked the requisite profit motive when he engaged in the transactions. With respect to section 165(c)(1), we found that Mr. Resser was involved in four distinct income-earning activities during 1982: (1) His employment as a risk analyst for traders clearing through Rialcor (with compensation of $236,550); (2) his daily activities on behalf of Bichon Venture Partnership (his portion of which was reported on Schedule E of petitioners' 1982 Federal income tax

return); (3) his work as a consultant (earning $40,775); and (4) his account RSR/QRF activity, described as "Investments" on Schedule C of petitioners' return. We found that Mr. Resser's account QRF trading activity was separate and distinct from his account AMR trading for Bichon and his other trading-related activities. We thus evaluated his account QRF activity separately and held that Mr. Resser's personal trading activity in account QRF was not conducted with the regularity or continuity necessary to consider the activity a trade or business. Our holding was based on the fact that no trading occurred in account QRF from the beginning of March 1982 until September 30, 1982. For the balance of the year, Mr. Resser traded TDY in account QRF on only 6 days, establishing only nine spreads. Additionally, Mr. Resser failed to establish whether his TDY trading consumed only a few minutes during the year or a significant portion of several days. We concluded that Mr. Resser's insubstantial and infrequent trading in TDY stock options did not constitute a trade or business and that petitioners were not entitled to deduct Mr. Resser's account QRF losses under section 165(c)(1).

With respect to section 165(c)(2), we stated that the Court has consistently held that, in order to deduct a loss under section 165(c)(2), the taxpayer must show that profit was the primary motivation for entering the transaction. We then

articulated petitioners' burden as one of proving that Mr. Resser executed the TDY stock option spread transactions "<u>primarily</u> for the purpose of obtaining an economic profit independent of tax savings". <u>Resser v. Commissioner</u>, T.C. Memo. 1991-423.

Despite Mr. Resser's testimony to the contrary, we held that Mr. Resser did not prove that he entered into the TDY transactions at issue primarily for profit:

> We are unpersuaded that * * * [Mr. Resser's] primary purpose for engaging in stock option spreads was to make a profit. In January 1982, * * * [Mr. Resser] failed to transact any stock option trades in the RSR account. In February, * * * [Mr. Resser] closed out one box spread that he had opened in 1981. From March until the end of September, * * * [Mr. Resser] did not enter into any stock option trades in the newly named QRF account. In a 2-week period, from September 30 to October 14, * * * [Mr. Resser] generated losses of $1,121,148. From October 15 to December 16, * * * [Mr. Resser] did not trade in the QRF account. On December 17, 1982, * * * [Mr. Resser] established his last spread for the year. The December 17 three-way box spread resulted in a net gain of $227,442. This reduced * * * [Mr. Resser's] overall QRF trading losses to an amount which exceeded the account RSR/QRF trading gains and his wages from Rialcor. In addition, the TDY trading losses resulted in petitioners' paying zero tax for taxable year 1982.
> * * * [Mr. Resser] was an experienced, sophisticated trader in option transactions, with the knowledge and background to make his own trading decisions. To execute the loss generating trades, * * * [Mr. Resser] established and used an account other than the one in which he conducted his primary trading activities. * * * [Mr. Resser] was undoubtedly aware of the favorable tax consequences arising from the offset of losses reported on Schedule C, Form 1040, against other income and deferring trading gains to subsequent years. * * *
> * * * [Mr. Resser's] overall trading pattern also indicates that the transactions were primarily tax-

motivated. * * * [Mr. Resser] traded on only 6 days in the QRF account, establishing a total of 9 spreads. The spreads established on September 30 and October 1 did not close any previously acquired leg and no gains or losses were realized on those dates. On October 11, 1982, * * * [Mr. Resser's] trading resulted in the realization of a $188,896 loss. On October 13, 1982, * * * [Mr. Resser] established a butterfly spread and simultaneously closed an April 70 call leg realizing a loss of $275,181. On October 14, 1982, * * * [Mr. Resser's] closing of prior transactions resulted in a net loss of $657,071.

On October 14, 1982, * * * [Mr. Resser's] Customer Account Status Report disclosed that he had open positions in his [QRF] account containing unrealized profits totaling $1,139,837. If * * * [Mr. Resser] would have closed all his positions on October 14, the net economic gain would have been approximately $18,689. The record indicates that * * * [Mr. Resser] consistently liquidated his loss legs and left the majority of his profitable legs open until the next taxable year. * * * [Mr. Resser's] Customer Account Status Report for December 17, 1982, indicated that the open positions in his account contained unrealized profits of $872,075. The net gains realized in 1983 resulting from the closure of those open option positions as of December 17, 1982, totaled $871,874. [Resser v. Commissioner, T.C. Memo. 1991-423.]

Petitioners argued that the facts of their case were similar enough to the facts of Laureys v. Commissioner, 92 T.C. 101, (1989), to warrant a decision that Mr. Resser's motivation was the same as the taxpayer's in Laureys. As mentioned, Laureys involved a registered market maker with the CBOE who engaged in TDY option spread transactions similar to Mr. Resser's TDY spreads. In Laureys, this Court found that there was no direct evidence of tax planning or motivation on the taxpayer's part and concluded:

> [The taxpayer's] primary purpose in engaging in options
> transactions, spread transactions, butterflies, and
> specifically the transactions in issue, was consistent
> with and part of his overall portfolio strategy to make
> a profit.  Thus, the transactions had sufficient
> economic substance to be recognized for tax purposes.
> See Yosha v. Commissioner, 861 F.2d [494 (7th Cir.
> 1988), affg. Glass v. Commissioner, 87 T.C. 1087
> (1986)] at 499.  [Laureys v. Commissioner, supra at
> 134-133.]

As a result, we disagreed with the Ressers' assertion that the

facts of their case were similar to those of Laureys and

distinguished Laureys as follows:

> First, we note that the taxpayer in Laureys relied
> almost exclusively on his trading activities in stock
> options as his sole source of income.  The taxpayer
> received practically no other income.  In contrast,
> petitioners had wages of approximately $250,000 as well
> as consulting income in excess of $40,000.
> Petitioners' need for offsetting tax losses to reduce a
> substantial amount of taxable income is apparent.
> Moreover, with other sources of income, it is evident
> that petitioners were not forced to rely on the TDY
> trading gains to earn a living.
> The taxpayer in Laureys engaged in market making
> for his own account on a full-time basis.  In the
> instant case, * * * [Mr. Resser] entered into just 9
> TDY spread transactions on only 6 days for his own
> account during the year (excluding the spread closed
> out in February 1982).  * * * [Mr. Resser] spent the
> majority of his time as a risk analyst, consultant, and
> trading for the Bichon Venture Partnership/AMR account.
> The taxpayer in Laureys traded in at least eight
> different option classes whereas * * * [Mr. Resser]
> traded only TDY stock options in the QRF account.  In
> Laureys, the taxpayer attempted to vary his strategy
> behind the trades in his account.  He was sometimes
> bullish, sometimes bearish, and sometimes attempting to
> capture a dividend.  * * * [Mr. Resser's] testimony is
> that he maintained a bearish strategy with respect to
> the TDY trades. * * *  [Resser v. Commissioner, T.C.
> Memo. 1991-423.]

In conclusion, we noted that tax benefits of Mr. Resser's option spread strategy "so far outweigh[ed] the economic profit potential" that we could not accept Mr. Resser's contention that he was primarily motivated by the desire to earn a profit. Id. Consequently, we sustained respondent's determination and disallowed the claimed losses from the account QRF TDY stock option transactions.

With respect to the section 6661 addition to tax, we held that Mr. Resser's principal purpose for the stock option trading in account QRF was the avoidance of Federal income tax, and, therefore, the trading activity met the section 6661(b)(2)(C) definition of a "tax shelter". Because we concluded that Mr. Resser had no substantial authority for the tax treatment of his TDY trading in taxable year 1982, we sustained respondent's determination. We likewise sustained respondent's imposition of increased interest under section 6621(c) because Mr. Resser's stock option spread transactions were not entered into for profit and thus any underpayment based on those transactions was attributable to a tax-motivated transaction.

## OPINION

As mandated by the Court of Appeals for the Seventh Circuit, we must decide whether the claimed losses generated by Mr. Resser's account QRF stock option spread transactions are "grossly erroneous items", as required by section 6013(e)(1)(B)

of the innocent spouse provision.  "Grossly erroneous items" are defined, in relevant part, as "any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law."  Sec. 6013(e)(2)(B).  A deduction has no basis in fact when the expense for which it is claimed was never, in fact, made.  Douglas v. Commissioner, 86 T.C. 758, 762 (1986).  A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made in support of its deductibility.  Flynn v. Commissioner, 93 T.C. 355, 364 (1989); Douglas v. Commissioner, supra at 762-763.  The spouse seeking relief need only prove that an item of deduction lacked either a basis in fact or a basis in law, but need not prove both.  See Id. at 762-763.  Ordinarily, a deduction has no basis in fact or law if it is "fraudulent", "frivolous", "phony", or "groundless".  Bokum v. Commissioner, 992 F.2d 1132, 1142 (11th Cir. 1993), affg. 94 T.C. 126 (1990); Douglas v. Commissioner, supra at 763.  Whether a claim of deduction is grossly erroneous must be evaluated as of the time of filing of the tax return.  Friedman v. Commissioner, 53 F.3d 523, 529 (2d Cir. 1995), affg. in part, revg. in part, and remanding T.C. Memo. 1993-549.

The parties do not dispute that the deduction in question had a basis in fact.  Consequently, our inquiry is whether the

deduction lacked a basis in law.  Mrs. Resser bears the burden to prove that the loss deduction had no basis in law at the time petitioners filed their 1982 Federal income tax return.  Rule 142(a); Busse v. United States, 542 F.2d 421, 425 (7th Cir. 1976).

Mrs. Resser relies on our holding in Resser I to prove that Mr. Resser's stock option spread losses are grossly erroneous items.  Specifically, she argues that, because we found "pursuant to well settled legal principles" that Mr. Resser's stock option trades were "not engaged primarily for profit", there was no legal basis for deducting the account QRF losses.

Respondent's principal contention is that, because the trades were legitimate, i.e., the trades were executed on a regulated exchange and entered into using the open outcry auction method during the regular trading period on the exchange, and, as recognized by the Court in Resser I,[8] the potential for both

---

[8] In Resser I, we stated:

> It is uncontested that the potential for profit exists in stock option spread transactions like those engaged in by petitioner, as does the potential for economic loss.  However, the fact that there is a reasonable expectation of profit is not determinative.  Ewing v. Commissioner, [91 T.C. 396,] 416.  The relevant test is whether petitioner's primary purpose for entering stock option spread transactions was for profit.  We agree with respondent that the TDY trades at issue were not primarily profit

(continued...)

profit and economic loss exists in transactions like those executed by Mr. Resser, there was a basis in law for the deduction when petitioners filed their return.

Profit motive is required by the provisions of the Internal Revenue Code governing the option spread transactions at issue. A loss incurred by an individual, to be deductible under section 165, must be "incurred in a trade or business" or "incurred in any transaction entered into for profit".  Sec. 165(c)(1) and (2).  To be engaged in a trade or business, a taxpayer must be involved in an activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit.  Groetzinger v. Commissioner, 480 U.S. 23, 25 (1987).  With respect to section 165(c)(2), the term "for profit" has been "interpreted to require that the 'nontax profit motive predominates.'"  Yosha v. Commissioner, 861 F.2d 494, 499 (7th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986) (quoting Miller v. Commissioner, 836 F.2d 1274, 1279 (10th Cir. 1988) revg. 84 T.C. 827 (1985)).  More specifically, profit motive refers to the desire for economic profit, independent of tax savings.  Fox v. Commissioner, 82 T.C. 1001, 1022 (1984); Surloff v. Commissioner, 81 T.C. 210 (1983).

---

[8](...continued)
motivated.  [Resser v. Commissioner, T.C. Memo. 1991-423.]

In Resser I, we held that Mr. Resser's "insubstantial and infrequent" personal trading activity in account QRF was not conducted with the regularity or continuity necessary for the activity to be considered a trade or business.  Mr. Resser's segregation of his personal trades into a separate account, the methodical closing out of loss legs and the holding open of unrealized gain legs, his trading of TDY options in account QRF on only 6 days of the year, the establishment of only 9 TDY option spreads on those 6 days, and his need to shelter substantial earned wages and other income also persuaded the Court that Mr. Resser was not motivated primarily by profit when he entered the transactions, but motivated solely by tax considerations.  Thus, as our opinion in Resser I makes clear, deduction of Mr. Resser's account QRF losses was prohibited by section 165(c)(1) and (2).  Moreover, the courts have consistently held that a transaction entered into solely for favorable tax consequences, having no commercial, legal, or profit objective, will not be given effect for Federal income tax purposes.  See, e.g., Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Knetsch v. United States, 364 U.S. 361 (1960); Yosha v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion 865 F.2d 1264 (5th

Cir. 1989). Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Bessenyey v. Commissioner, 45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967). It was thus under well-settled legal principles that we denied petitioners' deduction for the losses generated by Mr. Resser's account QRF option spread transactions.

On brief, respondent cites two cases to support a finding that, despite our holding in Resser I that Mr. Resser lacked the requisite profit motive, the claimed option losses are not grossly erroneous items. Each, however, is distinguishable from the instant case. See Russo v. Commissioner, 98 T.C. 28, 29 (1992) ("London Options" commodity straddle tax shelter initially sanctioned by several Internal Revenue Service private letter rulings); Anthony v. Commissioner, T.C. Memo. 1992-133 (no evidence presented by taxpayer, other than statutory notice of deficiency, to prove that disallowed losses from computer-leasing activity, which were eventually the subject of a compromise settlement between the Internal Revenue Service and the investors, were grossly erroneous). Respondent also makes much of our discussion in Resser I where, with regard to the section 6661 addition to tax, we stated:

> Section 1.6661-3(a)(2), Income Tax Regs., provides that the substantial authority standard is stricter than the reasonable basis standard. The regulation also states that a position with respect to the tax treatment of an item that is "arguable but fairly unlikely to prevail in court would satisfy a reasonable basis standard, but not the substantial authority standard." In the instant case, petitioners rely heavily on Laureys v. Commissioner, [92 T.C. 101 (1989)], to support the position that [Mr. Resser's] trading was profit motivated. Although we think [Mr. Resser's] position is arguable, the facts in Laureys are materially distinguishable from those of this case. Therefore, [Mr. Resser's] position might arguably satisfy the reasonable basis standard but falls short of satisfying the substantial authority standard. * * * [Resser v. Commissioner, T.C. Memo. 1991-423.]

We disagree with respondent that this mandates a finding that there was some basis in law for the account QRF loss deduction. In Laureys v. Commissioner, 92 T.C. 101 (1989), there was no direct evidence of tax planning or motivation on the part of the taxpayer. Our statement in Resser I indicates that Mr. Resser relied on Laureys with respect to the account QRF losses because the possibility of profit does exist in these types of transactions. However, as we found in Resser I, Mr. Resser's pattern of trading in account QRF clearly demonstrated his lack of a profit motive. Despite what respondent refers to as "the economic viability and legality" of the option spread transactions at issue, Mr. Resser's account QRF transactions were neither conceived nor executed with the dominant objective of making a profit. Mr. Resser, a sophisticated and experienced trader, designed his trades to produce a loss. He engaged in

trades on only 6 days in the taxable year and generated enough losses to offset almost completely both his and his wife's taxable income from other sources. Mr. Resser's pattern of trading reveals that he received what he sought--tax benefits to offset other income. Mr. Resser's activities with respect to account QRF were, fundamentally, a tax shelter. As such, the losses attributable thereto were not deductible under well-settled legal principles. Accordingly, the deduction derived from the account QRF option spread losses constitutes a grossly erroneous item as required by section 6013(e)(1)(B).

We have considered all of respondent's arguments and, to the extent not discussed above, find them to be without merit.

To reflect the foregoing,

<u>An appropriate order and decision will be entered</u>.